Good morning, Your Honors. My name is Allison Goddard, and I am here on behalf of Appellant Patrick Berry and the Puget class members. I will attempt to watch the clock and reserve three minutes for rebuttal. The District Court's order of dismissal was in error for two principal reasons. Excuse me just a moment. Oh, I see. My docket sheet says James Patterson is representing your firm today. Is that... It was correct, Your Honor. Mr. Patterson is very ill. All right. And you're replacing Mr. Patterson. I'm sorry. I'm the pinch hitter. I hope I can do as well. Very well. I see your name on the brief. Thank you. Go ahead. As good of a job as he would do, so... All right. Very well. Thank you. But thank you for also recognizing that I don't fit the description of a Jim Patterson. Two principal reasons why the Court's order of dismissal was in error. It was error for the District Court to hold as a matter of law that the defendant's So error in finding that by failing to follow the basic standard for review of a motion to dismiss in the Ninth Circuit. The Court completely disregarded the plaintiff's allegations that the DataPass scheme actually deceived consumers. And those allegations included the findings of the Senate report, which are included in the complaint and alleged on information and belief, and must be accepted as true, that 70 to 90 percent of the people who, quote, enrolled in this scheme didn't even know what it was. And the District Court did not give any weight to those allegations. The Court also, the District Court also improperly weighed the facts, stating that the Court was, quote, more persuaded by the information presented by defendants than the allegations of plaintiff's complaint. That's found in the record at page 9. And the Court also erred by basing its decision on an incomplete record that was cherry-picked by the defendants. This error affected every one of plaintiff's claims and warrants reversal of the judgment in its entirety. Can I ask how exactly, what do you want to recover here for your client? Here for my client? I mean, what do you want to, and I don't mean here in this Court, I mean in the action. Right. What is your damages? Recovery of the amounts paid to the defendants for their, the supposed rewards program. Didn't you get that back from, was it your credit card? My client, after a substantial, you know, activity on his part, did get ultimately the money back, but he lost the use of the money for the period of time. He lost the ability to accrue interest on the money. It was so many months at $12 a month. Is that correct? Exactly how much was involved? It was $12 a month, and I don't have in front of me right here the exact number of months. I could find it in the records. I thought it was four. Right. And the scheme as a whole. How much interest could it have possibly have been? Did he get, by the way, the $20 off the movie ticket? No, he did not, Your Honor. And the scheme as a whole built millions of dollars from consumers. But that's a separate issue. I'm just trying to figure out how he was injured, whether he was injured sufficiently to get him standing. It seems to me that the loss of $36, given what interest rates are. Or even 48. Or even 48. I mean, you're talking about pennies. Well, under this Court's precedent, the loss of lost interest in use of money is sufficient. And that's certainly not a issue raised by defendants. But if you look at, and I don't have a 28-J letter for this because it wasn't an issue, but it struck me last night as I was preparing that you may have a question about standing, Washington Legal Foundation v. Legal Foundation of Washington 271F3835 is a Ninth Circuit decision from 2001. And while I'd submit that the plaintiff may not have a significant amount at issue, he has sufficient amount at issue to have standing in this Court, and he is purporting to represent a class of people who have been bilked to the tune of millions of dollars. Yeah, but that's a separate issue. I mean, it's not he can't formulate standing based on what other people in the class have suffered, at least as I understand the law. I understand that, Your Honor. And I'm not trying to argue that his standing is based on the class members. I don't argue that at all. His standing is based on his lost use of the money. And I think his standing is clear under precedent. I just point out to the Court that the net effect of this scheme by defendants wasn't that my client lost a few pennies in interest. The net effect of the scheme was millions of dollars. If you end up with us agreeing with the district court that he had standing, you may have trouble with typicality of your named representative. But that's, I guess, off to the future. Is it cognizable for purposes of standing, not necessarily in terms of monetary recovery, but is it cognizable for purposes of standing, the hassle he went through or anybody has to go through to get the money back? Your Honor, I would submit that it is. Mr. Court didn't use that. Right. This is an issue that wasn't briefed. But I would submit that it is cognizable. It's probably not compensable. Right. Well, it's his lost time. It's his effort. Okay. So, Your Honor, it was also error for the court to dismiss, the district court to dismiss plaintiff's EFTA claim for an issue other than whether or not the plaintiff consented. The second prong of an EFTA claim is that defendants had to give, and for the EFTA claim we clarified, we're only appealing as to defendant web loyalty. Web loyalty was obligated to satisfy the statute to give plaintiff a copy of his authorization, the authorization that he purportedly provided. And they did not do so. It's our condition, and we've alleged in the complaint that they did not do so. The district court did not. Well, couldn't that be remedied simply by sending a copy? Well, Your Honor, there's no – to allow them to remedy it years later doesn't exactly satisfy the need to have it done at the time like this statute allows. What they did was they claimed that they sent him an e-mail with a confirmation, but my client claims he never got it. And so the issue is there's a factual dispute. It's not a clear-cut case, and it was improper for the district court to take judicial notice of what I would call the confirmation documents that they put in the record because they don't come from a source that is not subject to reasonable dispute. Well, you say judicial notice, but isn't it really more incorporation by reference? All of these documents that were allowed in were referred to in the complaint, were they not? I would separate out the enrollment page from the joint documents with respect to the incorporation by reference document. Why is that? And the reason why is because it doesn't contradict with respect to the joint documents at most it creates a factual dispute. We don't dispute. But wasn't even the enrollment page referenced in the complaint? It was, Your Honor. And I have a question. Wasn't that enough in terms of incorporation by reference? Again, I'm not saying judicial notice. I'm saying incorporation by reference. We don't, we don't. My client did not, we did not allege in the complaint. We allege that the enrollment page existed in the complaint. So we don't believe that it was proper under Branch to admit that, to incorporate that with Ork and Evil without looking at the entirety of the process. So that's one issue. But with respect to the joint documents, the confirmation page that was purportedly sent, we don't allege, we allege in the complaint that our client didn't get an authorization, didn't get a copy of his authorization. And they submitted it to show, well, yes, he did. And our, my submission would be when you've got a plaintiff saying, I didn't get this, and you have the defendant saying, yes, you did, you don't have the grounds for a motion to dismiss. You have a tribal, you have an issue of fact. So far we're sort of playing around the edges. I'm interested in whether or not there was a valid consent and as to whether the district judge was justified in concluding there was a valid consent. And one of the things that troubles me about what happened below is that we have screenshots submitted by the defendants that are incomplete. That is to say, it's not all of the things that he saw. So, for example, I don't, if I'm correct, we do not have in the record the first screenshot that he saw that induced him to click through. Is that correct? That's correct, Your Honor, and certainly we object to that. The expectation he would have had based on that first screen when he clicks through and then it turns out clicks yes or whatever the I'm going forward button is, we don't know. So how can, how can we go forward on a motion to dismiss without knowing all the stuff that he's talking about? I don't get it. I agree, Your Honor, and I think if you put it into perspective. So what would it tell us if we had it? It would give the overall net impression of the transaction. And so it would tell you, it would put you in the frame of mind of what the plaintiff saw and why he thought he was just giving his email address so they'd have a place to send the coupon. Now, there are a lot of places on that sheet that were given that are in fairly small print, but there are a lot of places where he says, you know, if you read it carefully, you know, I'm going to get billed $12 a month and da-da-da-da-da. The district judge thinks that's enough to be valid consent. Why do you disagree with that? Because, Your Honor, it's like, it's not like the plaintiff walked into the car dealership, said I'm here to buy a car, went into the finance office, was handed a stack of documents that's an inch thick, and said I can't be bothered to read this. This is not that case. This is not that case. It's more a case of cyberspace where the court looked, when you looked at the entire net impression, even though there were disclosures on the back of the check, the court reasonably looked and said, wait a second, this is a case where a person gets a check in the mail, it's made payable to them, and they cash it. And even though there's a disclosure on the back where they would endorse the check, the net impression overall isn't that I'm signing up for Internet service with no termination. How do we know or can we know from the document or the so-called screenshot that they supply what was actually on the screen in front of them? The screenshot that is in the ER is very long, and I assume that not all of it could have been on the screen at the same time. How do we know or do we know what was on the screen, what he would have seen before he has to click, while he clicks, and so on? Is there any way that we can know that based on the things that we have in front of us? Defendant knows. We don't. But they have the information. Well, your plaintiff maybe can tell us what he remembers having seen. Well, the discovery would, if we were entitled, if we were able to get discovery, we would ask, and Mr. Wisnarski testified in his deposition on the authenticity of the enrollment page, that WebLoyalty does have a script that they basically can run through and show real-time what's happening on the computer screen. But we weren't given that. And so basically in the motion to dismiss, we haven't been able to see any of that. Well, I'm looking at page 6 of the district court's order, which includes portions of, I assume, either the enrollment page or the underlying page. And it clearly says, I have read and agreed to the offer in billing details and authorized movie tickets to securely transfer my name. Isn't that consent right there? No, Your Honor, because why was he on that page in the first place? Because he thought he was entering into a contract? This is the same situation as cyberspace, and it's the same situation as Operating Engineers v. Gilliam. If you lure someone into a place, not, and they have no reason to believe that they're about to enter into a financial transaction, they can't be held to the terms of that transaction. The same thing happened in Operating Engineers v. Gilliam. I see my time is running short, and I'd like to reserve at least two minutes for rebuttal, but I would like to make the point, Your Honors, that if you look at Gilliam, he was, the defendant was sitting in a union office, and he thought he was just applying for union membership, and the court, this court held that he wasn't going to be bound by a contract that was slipped into the papers that would require him to pay money over a substantial period of time. It's the same situation here. Very well, counsel. You may reserve your time. We'll hear from Webb Loyalty or from co-defendants. Good morning, Your Honors. May it please the Court. My name is Jim Prendergast, and I represent the defendant Webb Loyalty. Why don't you move for summary judgment? It seems to me this whole procedure is awkward, including having hearings and discovery on judicial notice. Why didn't you just make a motion for summary judgment? Respectfully, Your Honor, I don't think it is awkward. In fact, it's highly consistent with the precedent of this Court as to how these kinds of solicitations are considered on a motion to dismiss. In fact, as we have just lodged with the Court, the Davis v. HSBC case did exactly that. It looked for incorporation by reference based upon the complaint and ruled as a matter of law at the motion to dismiss stage, having looked at the solicitation provided during those proceedings, that the solicitation was neither deceptive nor unfair under the UCL. Now, help me out. My understanding is that Webb Loyalty moved under 12b-6 and alternatively moved for summary judgment. That is correct. But movie tickets made a 12b-6 motion only. Do I have that correct? I believe that's correct. I can't recall if movie tickets joined in that reference. But let me be very clear. I do not believe that we need to move to Rule 56 in order to disclose of this case. That may be true, but I was just wondering to know why you wouldn't. Why wouldn't that have been the simplest thing to do since you could have avoided the problems of whether we know how it actually looked on the screen, exactly what the defendant's complaint saw. According to this court, for example, let's take for a moment. I'm not necessarily saying you had to. I'm just curious why you didn't. Number one, because I wanted to save my client money. We thought that this was a frivolous case given the disclosures that were very, very clearly present on the enrollment page. And getting through this case quickly through a motion to dismiss was entirely the appropriate course. As to the subject of whether or not. How much money is this course up to now? It's cost a lot. Some of you may have cost quite a bit more with discovery and other parts of the proceedings. But I do want to come back to this one point because it was referenced by Judge Fletcher as well as by counsel regarding not being able to so-called see the page in its entirety at the time that you looked at it, the enrollment page. Again, I point to Davis, Your Honor. In Davis, the court addressed exactly that issue and said in response to the plaintiff's complaint that somehow she could not see the entire online solicitation, that that did not serve to nullify the conclusion. That wasn't necessary to defeat the question of whether or not the document was incorporated by reference to the property. Well, that might have been in the context of that case. What was on the initial page? And this is where I do want to address this because there is a lot of going on here with the suggestion that that page somehow changes what's going on here. Well, I'd like to know what was on that page. And I will say, if we look at paragraphs 48 and 50 of the amended complaint, we learn, according to the plaintiff, that there were two things on that page. One was a so-called offer of a $10 certificate off your next movie ticket purchase. And two, what appeared to be, and it's not even clear, a reference to a thank you. Those are the only factual allegations as to what appears on that first page. Why didn't you supply that first page? Well, because you weren't part of the difficulty. Do you not have that page? I can't say that we don't have that page. I think there would be some difficulty in authenticating it for the purposes of a motion to dismiss. You know, it just doesn't make any sense to me that if you had that page and if that page is to your advantage, you would not have produced it. I don't get it. Your Honor, because we can't accept as true for the purposes of this motion to dismiss everything that the plaintiff says factually about that banner. What if that banner is such that, and this is a clear implication from what he's saying, I read that first thing as an offer to get something free. And based on that, I go to the next page. There's a lot of fine print. There's a beautiful coupon up at the top that says $10, but it's crossed out and it's 20, so it's even better. And there's a great big thing down here that says yes. Well, and we also know that the behavior of most people in response to this sort of solicitation is they click on yes without understanding what they're doing. Respectfully, I disagree with that, Your Honor. You disagree with what? I disagree with the notion that most people are simply going to click on yes as some sort of reflective approach. So you disagree with the report that's attached to the complaint? You think those conclusions are wrong? Oh, that's a highly politicized process, the Senate complaint. That's over a 10-year period. That has no connection necessarily to the page that this plaintiff saw, nor is there   I disagree with that. So what am I supposed to do with the notion that what we're talking about in terms of consent really is a question of he entered into a contract. I'm sorry, Your Honor. Your argument is he entered into a binding contract. Absolutely. Okay. Now, a binding contract requires meeting of the minds, right? Correct. And he says there was no meeting of the minds from my side. Your Honor, again, I would point out both in Operating Engineers, which counsel refers to, as well as in Davis, this plaintiff cannot sit there and ignore what's on this page. Particularly, and I'll point to Freeman, which I understand Judge Scanlon was on that panel as well. In Freeman, the court said that you simply, by doing enough reading to know that I have to click the button to enter my email, you would have known that you are entering into a contract. Because if we look right there at that point of the page, it says the card's going to be transferred, you're joining and signing up, and here are the offering and billing details, right at the point at which you enter that information. According to this court in Freeman, that makes any belief or inference of the type the plaintiff is making here, that this was something other than an enrollment for a fee-based membership, it makes that belief unreasonable. How does the client, how does the plaintiff or somebody in this situation know that instead of now dealing with movie tickets, they're dealing with you? There's some pretty fine print that says we're not affiliated. But, boy, that's easy to miss. Because on the top here is this same coupon. Boy, it just... Respectfully, I would address that in two ways. One, the language that you're talking about actually appears in two places. One, right at the coupon. Two, if you look right under the coupon, also at the bottom of the page. No, I've read it. Are we talking about the enrollment page? We're talking about the enrollment page. Page four of the order. Yes, exactly. And that right under the coupon is in much smaller print than the coupon itself, and in even smaller print than the regular small print on the rest of the enrollment page. We can't ignore the fact, Your Honor, that this is also being sponsored by Shopper's Discount, made prominently stated up on the top left-hand corner of the document. Not movie tickets. And every disclosure says you are enrolling in the Shopper's Rewards Program. Again, not movie tickets. I guess I have trouble divorcing myself in my own response to how I would have done this. If I click for a free coupon, I go on to the next page, and the only thing they ask me for is my e-mail. You would have tricked me. Your Honor, but that's not what we have only asked you for. We have asked you to do three things. We have asked you to enter your e-mail, to re-verify it, and then click yes. Yeah, I know. But most importantly, Your Honor. Listen to me, please. If that's the only thing I was asked, to give you my e-mail and to click yes, you would have – I would have clicked onto that, and I would have thought all I was getting was a free coupon. Fair enough, Your Honor. Now, maybe I'm stupid, too. Fair enough, Your Honor. But that is not all that we ask. We have to take it in the context of the full document. Again, Freeman, and in particular, at the place where he enrolled. But in terms of what you asked, in terms of affirmative steps from Mr. Berry or from me or anybody else, the affirmative steps I'm required to take are click through the enrollment page, give my e-mail, and then in the ordinary way give it again so to make sure I've entered it right, click yes. Boom. Yes, Your Honor. No credit card, no nothing. May I address that? Yes, of course. The point I would like to make is you can't just look at the buttons in isolation and say that's all there is. There is content, and there is content right there at the point at which you look at the buttons and learn the instruction to know to enter your e-mail, to know to click the yes. The instructions for that right at that point say we are going to get your credit card from movie tickets. We're going to bill you. Is this enrollment sheet, would it today be legal? Would it today be legal? Yes. Oh, absolutely. The only thing that would not be legal about it, Your Honor, is the so-called data pass under ROSCA. Under ROSCA today, you cannot pass data without getting it directly from the individual consumer. Which means in practical terms today on the enrollment page, I'd have to enter my credit card number? You have to put your full credit card number, yes, Your Honor. In other words, something that is to a consumer is a greater signal that I'm about to pay for something. Well, according to the Senate, but I would point out, according to the FTC, and its negative options report in 2006, which was the existing sort of guidelines, the reference there, and I believe it's page IV, and it's mentioned in movie tickets brief, is that if there is billing associated to get from a third party functionally data pass, then the key to making that appropriate is disclosure, not the question of input of full. Counsel, back to data pass for a second. What is it that has changed the impact of data pass? ROSCA fundamentally changes, ROSTA? ROSTA, the Retail Online Secure Shopper's Confidence Impact. It changed that the consumer must provide the full digits of their credit card, and that you can't do data pass by simple consent. Thank you. Don't you, isn't the reason you do it this way is because you understand that people are going to be sort of, I don't know what the right word is, are going to sign up without fully knowing what they're doing. Isn't this the way, isn't this why you do it this way? No, Your Honor. This is done to encourage people to enroll with minimal inconvenience. Of course it is a marketing objective. Of course it is an advertising objective. But a success in marketing, a success in advertising is not a case for deception, particularly where we have the repeated disclosures that are present in this document and are present in the enrollment page itself. What my counsel for plaintiff recommends here is not net impression of everything. She's actually asking for a solitary, selective impression from this banner page, which she's presented to you, not with facts as to what it says, because in terms of what it says, it's simply an offer of a $10 coupon. Put all of her beliefs and inferences from it. But it's very clear from the precedent of this court in cases like Freeman, in cases like Davis, that when one tries to take those kinds of inferences without reading the document and choosing to ignore the document, when they have not been affirmatively misrepresented to do so, then that kind of activity is unreasonable. She mentions cases like resort cars, operating engineers, and even cyberspace. But in each of those cases, the first contact that so-called encouraged the plaintiff to ignore the rest of the text was induced by affirmative misrepresentation, an out-and-out lie. For example, in cyberspace, a fake check-in invoice to make you believe that this was something else. In resort international, a dollar rent-a-car, buy it for a day, a dollar a day, and that was not so. In operating engineers, in response to the question of the plaintiff, is this simply an application to join the union, he was lied to and told yes, when in fact it was a collective bargaining agreement. Counsel, I assume you're going to speak for the entire 20 minutes. I am going to cede two minutes to my counsel. No, counsel, you've already passed that. There's only a minute and a half left. Oh, okay. Total, for your side, including your co-counsel. I'll give that minute to my co-counsel. Very well. Thank you. Good morning, Your Honor. Carrie Anderson with Weill Gottschall on behalf of MovieTickets.com. I'm not going to dispute what Mr. Patterson has said. We completely support it. I just wanted to bring to your attention one alternative grounds of dismissal that's specific to our client, MovieTickets.com, which is the Communications Decency Act. And I think we can rest on our brace for a good portion of that. But I just wanted to make clear to your honors that the CDA mandates that no provider or user of an interactive computer service shall be treated as a publisher or speaker of any information provided by another information content provider. And that is exactly I would submit the circumstances here. WebLoyalty is an advertiser. They place an advertisement on MovieTickets.com website. The content of that advertisement comes from WebLoyalty. There is sworn testimony in the record to that effect. Is there any allegation that the two of you coordinated in any way, what would appear? There is vague allegations that lump defendants together throughout the complaint. There are no specific factual allegations of conduct MovieTickets has undertaken to create the information on the WebLoyalty disclosure. As a matter of fact, despite the fact that we're at Rule 12, we did have depositions here. And Mr. Winiarski, a representative of WebLoyalty, testified very clearly that MovieTickets did not create the content on the WebLoyalty enrollment page. So this very court has held that through this provision, Congress granted most Internet services immunity from liability for publishing even false or defamatory material so long as the information was provided by another party in the Carafano case in 2003. CDA immunity casts a very wide net, and this court and many others have deemed that it should be construed broadly. There are three provisions. I realize I'm out of time. As outlined in the brief, MovieTickets has satisfied each of those provisions. And any liability that the plaintiffs seem to impose on MovieTickets as a result of the contents of WebLoyalty's disclosure page or this program cannot be sustained. And we respectfully submit that the dismissal of this complaint against MovieTickets should be sustained. Thank you. Counsel, did Judge Huff address this point in her order? Judge Huff, not in her second order. In her original order to dismiss the original complaint, she denied the motion as stating that the plaintiffs ---- Which order is that now? I'm looking at April 11, 2011, the order granting defendants plural motion to dismiss. It was her ---- Is that the first or the second? That's the second. It's her first. The order on her ---- I'm sorry? November 16, 2010. All right. She denied a motion to dismiss the original order. Following that, discovery clearly revealed that Mr. Winiarski testified that MovieTickets had no role in creating the enrollment page or the banner. Very well. Thank you. Thank you, Your Honors. Ms. Goddard, you have reserved time. Yes, Your Honors. Thank you. Just quickly on that last point, I would point in the record to you the excerpts at 282 to 285. I think that counsel has taken some liberties with her construction of the record. In Mr. Winiarski's testimony, he actually testified that Web ---- excuse me, MovieTickets did have the right to look at the advertisement, and it's certainly alleged in the complaint, to provide comments to it, to make changes. And if you look at the allegations of the complaint ---- How do we consider that? I mean, this is a motion for summary judgment. He's testifying solely for the purpose of taking judicial notice of documents, and now it's becoming a basis. You're arguing his testimony, quote, substantively. Well, my argument would be you can't look at this testimony on a motion to dismiss. My argument would be I'm just responding to her statement that it somehow closes the door on CDA liability for her client. My argument would be, at most, there's a factual dispute that discovery is warranted as to whether or not and how much of a role MovieTickets played. There are ample ---- there are ample sites in the record to MovieTickets' role. It's not just a quick and dirty, you know, they are an aider and better, or one paragraph in a complaint about a conspiracy. Counsel, as to Web loyalty, you heard my question to counsel. They moved to dismiss under 12v6, and alternatively, for summary judgment. Why can't we look at it from a summary judgment standpoint? Well, Your Honor, we didn't. We did not get ---- even though the notice was such, in the hearing on the motion, they essentially told the court that the court didn't need to consider it as a motion for summary judgment. That's in the record at 34 and 35. The judge had asked them directly and said, should I be considering this as a motion for summary judgment? And they said, no, Your Honor, you're taking judicial notice, and so you can consider this on a motion to dismiss. So we certainly would have made further objections if she had ruled at that point that it was a motion for summary judgment. And if I could just point out to the court, Davis is a very recent case, but it highlights how this case is so not Davis at all. In Davis, Mr. Davis went to the website to sign up for a credit card. That is not what my client was doing when he clicked through to get to that page where he put in his e-mail address. He clicked on that page to get a coupon. He didn't click on that page to enter a contract with Web loyalty. I know you're over time, but I'm having trouble with figuring out what was actually seen both initially, and I know we don't have that, but I'm also reading the allegation of the complaint. Once a customer clicks on the coupon, that is to say the page we've never seen, a new pop-up window appears. I'm reading from paragraph 21. A new pop-up window appears over the movie tickets checkout page, which is still visible under the window. This pop-up window directs the customer to enter an e-mail address, clicks a large confirmation button. In addition to this oversimplified enrollment process, the second pop-up also includes voluminous text and relatively small text that is not visible without scrolling and maximizing the window. Well, I understand scrolling, but also maximizing. That suggests that the print is too small to read. How do I know that what was presented here in the excerpts was on his screen large enough for him to read? I know that they've enlarged it to say this is what it looks like on a 17-inch. I got that part, but how do I know that it was large enough on his screen for him to read it? I believe we've alleged that it wasn't, that it was not large enough to call his attention to it. I'm not saying he couldn't read it at all, but I think the fact of the matter is we won't know that unless we get discovery. Okay. But what about the enrollment page itself? Just above the yes button, there is a recital that by signing, et cetera, and then you enter your e-mail address twice. Isn't that all we really need to know? No, Your Honor, because it's like Gilliam. He had no reason to even look at that particular part of the page. He thought he was getting his e-mail address in order to get the coupon. But you're saying he was under no obligation to pay attention to what was immediately above the e-mail address box? That's correct, Your Honor, because he had no concept that he was getting into a financial transaction. And if you look, what's even more prominent is below that, the big green yes button. That's much more prominent than the fine print above it. And it's a question of fact. It's not a clear-cut answer where you could determine as a matter of law it wasn't deceptive. The fact of the matter is they did this. They did this because if you look at the excerpts of record on page 289, 70 percent less people signed up if you didn't do the data pass. 70 percent less. That's alleged in the complaint, and the district court ignored it. All right. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: Korman, O'scannlain, Fletcher